J-A09039-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| IN THE INTEREST OF: A.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1288 WDA 2024 |

Appeal from the Order Entered September 25, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000004-2024

BEFORE:  KUNSELMAN, J., NICHOLS, J., and LANE, J.

MEMORANDUM BY LANE, J.:                    **FILED: June 11, 2025**

C.W. ("Mother") appeals from the order terminating her parental rights to her child, A.B. ("Child"), born in June 2021.  We affirm.

On January 31, 2022, the Allegheny County Office of Children, Youth, and Families ("CYF") received a report that: Mother was keeping heroin needles near Child's spoon; Mother had "track marks;" A.B. ("Father") appeared to be under the influence and looked unwell; and Mother needed to turn herself in to law enforcement authorities, leaving Child solely in the care of Father.  N.T., 8/2/24, at 11.  Following a visit, CYF determined that Child could not remain in the care of Mother and Father (collectively, "Parents") due to substance abuse concerns and "items found around the home."  ***Id***.

On February 3, 2022, CYF obtained protective custody over Child.  Since that time, Child has remained in the custody of maternal cousins ("Foster Parents").  Foster Parents are a pre-adoptive resource for Child.  Following the

removal of Child, Mother turned herself in on criminal charges, and she remained in detention until her release on March 1, 2022. Mother was again briefly incarcerated in March 2023. **See** N.T., 8/2/24, at 27, 34, 126.

The Juvenile Court adjudicated Child dependent on May 18, 2022. The court established reunification goals for Mother, which required her to: participate in mental health treatment; participate in drug and alcohol treatment and submit to random weekly urine screens; complete a parenting program; obtain appropriate housing; and visit with Child.

On January 3, 2024, CYF filed the underlying petition to terminate Parents' parental rights. The Orphans' Court conducted a hearing on the termination petition on August 2, 2024.[1] Keri Vanderpool ("Vanderpool"), CYF Casework Supervisor, testified to the following. Mother did not provide documentation showing that she had engaged in mental health treatment. **See** N.T., 8/2/24, at 13. She completed a parenting program during one of her periods of incarceration. **See id**. at 13, 24.

---

[1] The Orphans' Court appointed KidsVoice to serve as Child's counsel and guardian *ad litem* ("GAL") in this matter, finding that there was no conflict between Child's best interests and legal interests. **See** Order, 3/20/24; **see also In re Adoption of K.M.G.**, 240 A.3d 1218, 1235 (Pa. 2020) (holding that, where Orphans' Court appoints same party to serve as legal interest counsel and GAL, "appellate courts should review *sua sponte* whether the [O]rphans' [C]ourt made a determination" that the child's legal interests and best interests "did not conflict"). KidsVoice advocated for the termination of Mother's parental rights at the hearing and has filed a brief in this Court in support of the affirmance of the termination order.

Mother completed a drug and alcohol inpatient treatment program at Gaudenzia, in Erie, Pennsylvania, in January 2024. *See id*. at 13-14, 24. After completing the inpatient program, Mother began participating in an outpatient program through the same provider. *See id*. at 25-26. CYF scheduled Mother for thirty-six drug screens between May 18, 2022, and March 10, 2023. *See id*. at 14-22. Mother attended twenty-two of the drug screens, and she tested negative at each screen she attended. *See id*. at 15, 28. CYF stopped scheduling Mother for drug screens in March 2023, due to her incarceration and subsequent move to Erie. *See id*. at 15, 27-28.

With respect to housing, Mother did not obtain suitable housing by the date of filing of the termination petition. *See id*. at 12. However, Mother reported to CYF that she moved into a two-bedroom apartment in Erie, subsequent to her completion of the Gaudenzia treatment program in January 2024. *See id*. at 12, 14. Although CYF requested that the corresponding Erie County agency conduct a courtesy assessment of Mother's apartment, the assessment had not occurred by the date of the hearing. *See id*. at 31-32.

Concerning visitation, during Mother's initial period of incarceration in February and March 2022, Mother was permitted two virtual visits with Child, as well as in-person visits at her facility. *See id*. at 16. Beginning in July 2022, Mother visited with Child once per week for four hours. *See id*. Following Mother's move to Erie, Mother's visitation schedule was once every other week. *See id*. The Orphans' Court authorized Mother to have

unsupervised visits on December 8, 2022, but she never progressed beyond supervised visits based upon a subsequent relapse. *See id*. at 16.

Vanderpool stated that Mother was "[f]or the most part" consistent in her visitation with Child. *Id*. at 17. However, there were "extended period[s]" when Mother did not visit with Child, either following a relapse or during periods of incarceration. *Id*.; *see also id*. at 35, 38-39 (explaining that Foster Parents would sometimes not hear from Mother "for a few days or weeks" and that Mother only visited Child twice in person and twice virtually during one five-month period).

Vanderpool also testified regarding her personal observations of Child in the kinship foster home. Child appeared happy and carefree during the visits and shared a parental bond with Foster Parents. *See id*. at 19. Foster Parents provided for all of Child's needs and ensure that he attends necessary medical appointments. *See id*. at 20. Child did not have special needs. *See id*. While no other children lived in the foster home, Child had regular contact with cousins and an older maternal half-sister. *See id*. at 19-21.

Sherri Ihrig ("Ihrig"), CYF Permanency Caseworker, testified to the following. Ihrig's first involvement with Child's case was in July 2023, when she began working on an adoption home study of Foster Parents' home. *See id*. at 49-51. Ihrig visited the foster home every other month from that point forward, where she had the opportunity to observe Child's interactions with Foster Parents. *See id*. at 51, 56. Ihrig described Child as "a happy little boy," with many toys, several pets, and frequent interaction with extended

- 4 -

family. *Id*. at 56. Ihrig stated that Child was comfortable in the home, healthy, and recently "had a good checkup" at the dentist. *Id*. Foster Parents informed Ihrig on numerous occasions that they did not intend to cut Child off from Parents or extended family. *See id*. at 54, 70.

Ihrig became the "direct service caseworker" for Child's case in April 2024, and she reached out to introduce herself to Parents at that time. *Id*. at 49-51. Ihrig's communications with Mother have been confined to text messages arranging financial assistance for Mother's travel from Erie to Pittsburgh for visits with Child. *See id*. at 55. Ihrig's understanding was that Mother was attending drug screens at Gaudenzia and at the Erie County probation office. *See id*. at 64, 66. However, Mother did not provide CYF with the results of her Erie screens. *See id*. at 66.

CYF also presented psychologist Terry O'Hara, Ph.D. ("Dr. O'Hara"), as an expert in forensic psychology. He testified to the following. Dr. O'Hara completed an interactional evaluation of Child with Foster Parents on April 2, 2024. *See id*. at 78. Dr. O'Hara observed several positive parenting skills during his interaction with Foster Parents, including that they were: interactive with Child; redirected and praised him; were open to Parents having contact with Child; and understood the importance of different cultures and backgrounds. *See id*.

Dr. O'Hara observed indicators of a secure attachment between Child and Foster Parents. *See id*. at 80. Child directed himself to Foster Parents and was happy, smiling, playful, and vocal in their company. *See id*. at 79-

81. Dr. O'Hara stated that he had no concerns regarding Child's engagement with Foster Parents, as they "presented with significant ability, [had] strong parenting skills, and [Child] really engaged well with them." *Id*. at 79, 98. Dr. O'Hara opined that there would be "significant detriment" to Child if the court severed his relationship with Foster Parents. *Id*. at 98. Dr. O'Hara emphasized that permanency of caregivers was "crucial" for a foster child, as it provided the "foundation for appropriate development for children." *Id*. at 99.

On May 14, 2024, Dr. O'Hara completed an individual evaluation of Mother and an interactional evaluation with Mother and Child. *See id*. at 85, 90. Mother reported that she achieved sobriety on March 3, 2023. *See id*. at 86. Mother admitted to a history of depression, which Dr. O'Hara stated could impact her parenting ability if not sufficiently addressed. *See id*. at 87. Mother acknowledged a history of intimate partner violence ("IPV"), including one incident of physical violence involving Father and physical, emotional, and sexual violence with a prior partner. *See id*. at 88-89.

Dr. O'Hara diagnosed Mother with: moderate opioid use disorder — sustained remission; mild stimulant use disorder; and suspected spouse or partner violence — physical, psychological, and sexual violence. *See id*. at 89-90. Dr. O'Hara stated that if Mother did not sufficiently address her mental health and substance abuse issues, it would be "very difficult for [her] to provide an environment of safety, stability, and security to" Child. *Id*. at 90. Dr. O'Hara stated that exposure to IPV "place[s] children at risk for mental

health issues, substance abuse concerns, [and] increased medical problems." *Id*. at 89.

During the interactional evaluation, Child "engaged very well with" Mother, laughed and smiled with her, and "directed himself to" Mother. *Id*. at 91-92. Mother informed Dr. O'Hara during the interactional evaluation that she was close to obtaining permission for unsupervised visits with Child, until she relapsed in or around January 2023. *See id*. at 91, 114-15.

Dr. O'Hara opined that he did "not have evidence" that Mother was able to provide full-time care for Child. *See id*. at 92. Dr. O'Hara noted multiple specific concerns that led him to this conclusion, including Mother's: long-standing involvement with CYF; long-term substance abuse concerns; minimal progress on achieving the court-ordered goals for reunification; not having any of her older children in her care; and inability to address mental health issues. *See id*. at 92-95.

Dr. O'Hara testified that there would be potential detriment to Child if Mother's parental rights were terminated, given the relationship he observed between the two during the interactional evaluation. *See id*. at 95-96. However, Dr. O'Hara indicated that the court must balance any potential detriment to Child against the potential that Mother would be unable to "sufficiently demonstrate stability and address the issues which necessitated placement for" Child. *Id*. at 96. Dr. O'Hara further stated that Child's secure attachments to Foster Parents would mitigate any detriment caused by termination of Mother's parental rights: "When children experience security

and attachment with at least one caregiver, children are able to tolerate distress much better than children who do not have that relationship with a caregiver." *Id*. at 97.

Mother testified to the following. Mother acknowledged that she and Father had a history of drug use and that engaging in drug and alcohol treatment was one of the goals for her reunification with Child. *See id*. at 125, 127. Mother stated that she has been sober since March 3, 2023. *See id*. at 129. She continued to attend outpatient drug and alcohol therapy as of the date of the hearing and provided bimonthly drug screens to her probation officer. *See id*. at 128-29. Mother also attended Narcotics Anonymous meetings. *See id*. at 129, 140-41. Mother noted that she was currently in one of her longest ever periods of sobriety and had been able to avoid many of the triggers that caused her relapses since she moved to Erie. *See id*. at 141-42.

Mother acknowledged that mental health treatment was also a court-ordered goal for reunification. *See id*. at 127, 130. While Mother received mental health therapy when she "was younger" and during inpatient drug and alcohol program stays, she does not currently engage in mental health therapy due to insurance issues. *See id*. at 130-31. She did not believe that she needed mental health therapy in order to raise Child but believed it could help. *See id*. at 131.

Mother stated that she has a history of IPV, but the last such incident was in 2023. *See id*. at 125-26. She understood that exposure to IPV has

detrimental effects for children, having "witnessed it with" her own mother. *See id*. at 144. Mother completed a parenting class, which taught her various valuable lessons about child development. *See id*. at 133-34.

At the time of the hearing, Mother rented a two-bedroom apartment in Erie and worked full-time at a factory there. *See id*. at 132, 138. While CYF has not evaluated her apartment, she stated that it was suitable for Child. *See id*. at 132. Mother indicated that she has support from her parents and other extended family members to assist her in caring for Child, although that support network was largely in Pittsburgh. *See id*. at 138, 145. She stated that while "[i]t would make a lot more sense for [her] to be down [in Pittsburgh, she knew] that as of right now [she] can[not]" live there due to the potential for relapses. *Id*. at 145.

Mother requested the court deny the termination petition to allow her more time to work towards reunification. *See id*. at 151. She stated that Child was "really upset" at the end of visits and "ask[ed] if [she] can stay longer." *Id*. at 149. Mother's visits with Child often included her parents and Mother's older child who lived with her parents. *See id*. at 147-48. Mother noted the importance of maintaining contact with extended family, which may be lost if her rights were terminated. *See id*. at 150-51.

On September 25, 2024, the Orphans' Court entered the underlying order terminating Mother's parental rights to Child, under 23 Pa.C.S.A. §§

2511(a)(2), (5), (8), and (b).[2]  Mother filed a timely notice of appeal, along

with a Pa.R.A.P. 1925(a)(2) concise statement of errors complained of on

appeal.  The court subsequently filed an opinion pursuant to Rule 1925(a).

Mother presents the following issues for our review:

1. Did the [Orphans' C]ourt abuse its discretion and/or err as a
   matter of law by involuntarily terminating Mother's parental
   rights pursuant to 23 Pa.C.S.[A.] § 2511(a)(2)?

2. Did the [Orphans' C]ourt abuse its discretion and/or err as a
   matter of law by involuntarily terminating Mother's parental
   rights pursuant to 23 Pa.C.S.[A.] § 2511(a)(5)?

3. Did the [Orphans' C]ourt abuse its discretion and/or err as a
   matter of law by involuntarily terminating Mother's parental
   rights pursuant to 23 Pa.C.S.[A.] § 2511(a)(8)?

4. Did the [Orphans' C]ourt abuse its discretion and/or err as a
   matter of law in concluding that CYF met its burden of proving
   by clear and convincing evidence that termination of Mother's
   parental rights would best serve the needs and welfare of
   [Child] pursuant to 23 Pa.C.S.[A.] § 2511(b)?

Mother's Brief at 6.

When reviewing a decree terminating parental rights, we

accept the findings of fact and credibility determinations of the
trial court if they are supported by the record.  If the factual
findings are supported, appellate courts review to determine if the
trial court made an error of law or abused its discretion.  As has
been often stated, an abuse of discretion does not result merely
because the reviewing court might have reached a different
conclusion.  Instead, a decision may be reversed for an abuse of
discretion only upon demonstration of manifest
unreasonableness, partiality, prejudice, bias, or ill-will.

_____

[2] The Orphans' Court also terminated Father's parental rights to Child.  This
panel affirms that termination order at Superior Court docket 1289 WDA 2024.

. . . [U]nlike trial courts, appellate courts are not equipped to make fact-specific determinations on a cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*Interest of K.T.*, 324 A.3d 49, 56 (Pa. Super. 2024) (citations omitted).

We apply a bifurcated analysis to determine whether termination of parental rights is proper under Section 2511.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*Id*. (citation and brackets omitted). To satisfy the clear and convincing evidence standard, the petitioner must present evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id*. at 56-57 (citation omitted).

The Orphans' Court determined that CYF met its burden to terminate Mother's parental rights under Section 2511(a)(2), (5), (8), and (b). We need only agree with the court's decision as to any one subsection of Section

- 11 -

2511(a), in addition to subsection (b), to affirm the termination of Mother's parental rights. *See id*. at 57. Here, we examine the propriety of the court's ruling under subsections (a)(8) and (b), which provide:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> \* \* \* \*
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> \* \* \* \*
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

To satisfy Section 2511(a)(8), the petitioner must present clear and convincing evidence: "(1) that the child has been removed from the care of the parent for at least twelve months; (2) that the conditions which led to removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child." *Interest*

- 12 -

*of M.E.*, 283 A.3d 820, 832 (Pa. Super. 2022). Unlike other Section 2511(a) subsections, subsection (a)(8) "does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement" of the child. *Id*. Instead, the relevant inquiry "is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *Id*. (citation omitted).

Under this subsection, the court "shall not consider any efforts by the parent to remedy the conditions described [in the termination petition] which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b).

> [B]y allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit [eighteen] months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

*Interest of M.E.*, 283 A.3d at 832 (citation omitted).

Mother argues "there was no evidence of current drug use, mental health incapacity, intimate partner violence, or other condition that originally caused [Child] to be removed from [Mother's] care." Mother's Brief at 22. Mother contends that the Orphans' Court erred by considering her move to

Erie — which she contends was necessary for her to achieve sobriety — as Section 2511(b) prohibits termination of parental rights based on "environmental factors" "beyond the control of the parent." 23 Pa.C.S.A. § 2511(b). Mother further asserts that there was insufficient evidence to show that termination best served Child's needs and welfare.

The Orphans' Court concluded that CYF met its burden under Section 2511(a)(8). The court observed that the conditions which led to Child's removal were Parents' abuse of drugs and alcohol; exposure of Child to dangerous substances; and leaving Child without proper parental care. The court found Mother had not fully addressed her drug and alcohol abuse issues as she "was continuing to battle her addiction . . . through a program in Erie County" as of the date of the termination hearing. Orphans' Court Opinion, 11/21/24, at 18.

The Orphans' Court noted that Mother reported she had obtained housing, but only after the filing of the petition to terminate her parental rights. The court observed that Mother was never able to progress to unsupervised visitation with Child. The court found that, although severance of the parent-child bond would have a negative impact on Child, termination of parental rights would nevertheless best serve Child's needs and welfare. The court emphasized that Child was in a pre-adoptive foster home and had a strong bond with Foster Parents.

Based on our review, we conclude the evidence supports the Orphans' Court findings that termination of Mother's parental rights was appropriate

under Section 2511(a)(8). *See Interest of K.T.*, 324 A.3d at 56. With respect to the first element under subsection (a)(8), there is no dispute that Child was in CYF's care for more than twelve months. *See Interest of M.E.*, 283 A.3d at 832. At the time of the hearing on the termination petition, Child had been out of Parents' care for more than thirty months.

Turning to the second element, there is ample support in the record for the Orphans' Court's determination that the conditions which led to Child's removal still existed. *See id*. Mother made some progress towards addressing the court-ordered goals for reunification with Child. She completed a parenting class and inpatient drug program, and she was generally consistent with her visitation of Child. *See* N.T., 8/2/24, at 13-14, 17, 24. However, the record reflects that Mother had not sufficiently remedied the conditions that brought Child into care such that reunification was imminent at the time of the hearing. *See Interest of M.E.*, 283 A.3d at 832.

With respect to drug abuse, Mother was still attending outpatient drug treatment at the time of the termination hearing. *See* N.T., 8/2/24, at 25-26, 128-29. Furthermore, Mother did not provide CYF with evidence of her drug screens from the rehab facility or the Erie County probation office. *See id*. at 66. Therefore, the last drug screen that Mother submitted was in March 2023, fourteen months prior to the termination hearing. *See id*. at 15. Mother's history of relapses also resulted in "extended period[s]" where she was not visiting Child and prevented her from progressing to unsupervised visitation. *Id*. at 16-17.

Mother also failed to demonstrate compliance with the goal that she participate in mental health treatment. *See id*. at 13. Indeed, Mother admitted to a history of depression and that mental health therapy would assist her in parenting Child. *See id*. at 87. Dr. O'Hara explained that Mother's inability to sufficiently address her mental health and substance abuse issues would make it "very difficult for [her] to provide an environment of safety, stability, and security to" Child. *Id*. at 90.

Furthermore, Mother failed to meet her goal of obtaining suitable housing. While Mother reported to CYF that she had leased an apartment in Erie, CYF was unable to assess the suitability of the housing as of the date of the hearing due to its distance from Allegheny County. *See id*. at 12, 14, 31-32. Importantly, Mother did not obtain housing until *after* the filing of the termination petition. *See id*. at 12. When the agency proceeds under Section 2511(a)(8), the Orphans' Court "shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b). Therefore, the court did not abuse its discretion by finding that the conditions which led to Child's removal continued to exist.

With respect to the third element of Section 2511(a)(8), we discern no abuse of discretion in the Orphans' Court's finding that termination of Mother's parental rights best served Child's needs and welfare. *See M.E.*, 283 A.3d at 832. As explained in more detail below in our subsection (b) analysis, Child had been in the care of Foster Parents for approximately thirty months at the

time of the hearing, far longer than he spent in Mother's care. Foster Parents shared a strong bond with Child and provided for all of his needs. While termination would sever a bond between Child and Mother, the court was within its authority to prioritize the continuity of Child's relationship with his current caregivers.

Finally, we reject Mother's argument that the Orphans' Court erred by considering her move from Allegheny County to Erie. Initially, we observe that the court only considered her move to the limited extent it prevented CYF from evaluating her Erie apartment and otherwise monitoring her compliance with her court-ordered goals. *See* Orphans' Court Opinion, 11/21/24, at 18. Moreover, we do not find that a parent's decision to move several hours away from her child is akin to the "environmental factors such as inadequate housing, furnishings, income, clothing and medical care" addressed by Section 2511(b). 23 Pa.C.S.A. § 2511(b). In any event, Section 2511(b) prohibits a court from "solely" considering such environmental factors when terminating parental rights, and here the court considered numerous other factors in addition to Mother's move away from Allegheny County. *Id*.

Accordingly, we conclude the Orphans' Court did not err or abuse its discretion in finding CYF established grounds for termination of Mother's parental rights under Section 2511(a)(8). *See Interest of K.T.*, 324 A.3d at 56. Because we agree with the court as to subsection (a)(8), we need not reach the merits of Mother's argument pertaining to subsections (a)(2) and (a)(5). *See id*. at 57.

In her final issue, Mother asserts the trial court abused its discretion in finding CYF presented sufficient evidence for termination under Section 2511(b). The Section 2511(b) analysis considers the matter from the child's perspective and places the child's developmental, physical, and emotional needs over the concerns of the parent. *See Interest of K.T.*, 324 A.3d at 59. The trial court must consider the emotional bond between the parent and child, with the threshold for the bond inquiry being whether termination will sever a necessary and beneficial relationship. *See id*. at 59-60.

> The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care . . . ; whether the child is in a pre[-]adoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability.

*Id*. at 59 (citation omitted).

Mother argues that CYF failed to meet its burden under Section 2511(b) that termination would best serve Child's needs and welfare. According to Mother, the record shows the opposite: that termination would have a "significant detrimental impact" on Child. Mother's Brief at 25. Mother asserts that Child derives "invaluable and irreplaceable benefits from his relationships with Mother" and other maternal relatives, and he deserves to have those relationships preserved. *Id*. at 26.

The Orphans' Court found that, considering Child's current needs and projected development, termination of Mother's parental rights best served

Child's needs and welfare. The court observed that Child "is in a pre-adoptive foster home and clearly has a strong bond with both of his Foster Parents." Orphans' Court Opinion, 11/21/24, at 21. The court recognized that Mother and Child share a bond and that severing that bond would have an adverse impact on Child. Nevertheless, the court concluded that placement of Child in a permanent home with Foster Parents outweighed the harm from severing the bond.

After careful review, we determine the evidence supports the Orphans' Court's findings and Section 2511(b) analysis. *See Interest of K.T.*, 324 A.3d at 56. The court was free to weigh the adverse impact from the severing of Mother's bond with Child against the detriment Child would face if his relationship with Foster Parents ended. *See id*. at 60. While Mother undoubtedly had a bond with Child, Dr. O'Hara observed that her mental health and substance abuse issues made it "very difficult for [her] to provide an environment of safety, stability, and security to" Child. N.T., 8/2/24, at 90. Dr. O'Hara further indicated that the court must balance any detriment to Child from termination against the possibility that Father would be unable to "sufficiently demonstrate stability and address the issues which necessitated placement for" Child. *Id*. at 96.

Additionally, there was ample evidence of record that Foster Parents provided for all of Child's needs, demonstrated excellent parenting skills, and shared a strong bond with Child. *See id*. at 19-20, 56, 78-79, 98. Indeed, Dr. O'Hara opined that there would be a "significant detriment" to Child if he

lost his relationship with Foster Parents, with whom he had lived for the great majority of his young life and who were a pre-adoptive resource. *Id*. at 98. Moreover, Dr. O'Hara found that the security and strong attachment Foster Parents provide for Child would help to mitigate any harm caused by the termination of Mother's parental rights. *See id*. at 97.

In light of the foregoing, we do not disturb the order of the Orphans' Court terminating Mother's parental rights to Child.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 06/11/2025